**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| GARY STOCCO<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY AND COMPANY;<br>LILLY USA LLC<br><br>Defendants. | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: ____________ |

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the District of New Jersey as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors:

_X_ Plaintiff currently resides in Toms River, New Jersey (City/State).

_X_ Plaintiff purchased and used Defendant(s)' products in Toms River, New Jersey (City/State).

__ The Original Venue is a judicial district in which Defendant __________ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

__ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)):

______________________________________________________________________.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and

the Original Venue is a judicial district in which Defendant ______________ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): ____________________________________________ .

**COMPLAINT AND JURY DEMAND**

COMES NOW, Plaintiff GARY STOCCO ("Plaintiff"), by and through the undersigned attorneys, and brings this action against ELI LILLY AND COMPANY and LILLY USA LLC (hereinafter "Defendant" or "Eli Lilly") for personal injuries, including the development of non-arteritic anterior ischemic optic neuropathy ("NAION"), which Plaintiff suffers from as a proximate result his use of Defendant's drug, Mounjaro. Plaintiff alleges the following:

**NATURE OF THE ACTION**

1. This is an action for damages relating to Defendant's research, testing, development, manufacturing, labeling, marketing, promoting, selling, inspecting, and distribution of Mounjaro, an injectable prescription medication approved by the U.S. Food and Drug Administration ("FDA") to improve blood sugar control in adults with type 2 diabetes.

2. Mounjaro is a brand-name prescription medication containing tirzepatide. Tirzepatide is a glucagon-like peptide-1 receptor agonist (GLP-1 RA). The GLP-1 hormone is made by the small intestine, and, among other things, it triggers insulin to release from the pancreas, blocks glucagon secretion, and slows stomach emptying. GLP-1 RAs, including tirzepatide, mimic the GLP-1 hormone by attaching to cell receptors and triggering the effects of the GLP-1 hormone.[1]

3. As a result of, among other things, Defendant's failure to warn physicians and end users of Mounjaro of the complications and devastating effects of which the company knew or should have known, including NAION, Plaintiff was prescribed and took Mounjaro as directed by his physicians, and due to Plaintiff's Mounjaro use, he developed NAION in his right eye and

[1] https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists. (Last accessed Jan. 30, 2026).

suffers from severe physical and emotional injuries, as well as radical changes to his lifestyle due to his severe loss of sight.

4. NAION, also referred to as an "eye stroke," is caused by decreased blood flow to the optic nerve. It causes optic swelling and sudden, painless and permanent vision loss in one or both eyes. There is no proven effective treatment for NAION.[2]

5. Plaintiff brings this action for personal injuries as a proximate result of his prescription and use of Mounjaro. Accordingly, Plaintiff seeks compensatory and punitive damages, and all other available remedies provided to him under the law because of injuries he sustained due to Defendant's wrongful conduct.

**PARTIES**

6. At all relevant times, Plaintiff Gary Stocco was a resident and citizen of the State of New Jersey and Ocean County.

7. Plaintiff used Mounjaro, Defendant's drug, which contains the active ingredient tirzepatide, a GLP-1 RA, and as a result, suffers from NAION.

8. Defendant Eli Lilly and Company is an Indiana Corporation with a principal place of business at 893 S. Delaware St., Indianapolis, Indiana.

9. Defendant Lilly USA, LLC is an Indiana LLC with a principal place of business 893 S. Delaware St., Indianapolis, Indiana.

10. Defendant, as holder of Mounjaro's new drug application (NDA), is responsible for conducting Mounjaro's clinical trials, post-market surveillance and pharmacovigilance, as well as reporting adverse events regarding Mounjaro use to the FDA.

---

[2] https://www.nanosweb.org/i4a/pages/index.cfm?pageid=4196#:~:text=Most%20people%20with%20NAION%20do,a%20diagnosis%20of%20sleep%20apnea. (Last accessed Jan. 31, 2026).

11. Upon information and belief, Defendant failed to warn physicians and the end users of Mounjaro, including Plaintiff and Plaintiff's treating physicians, of the complications and devastating effects of using Mounjaro which Defendant's knew or should have known.

**JURISDICTION AND VENUE**

12. The Original Venue has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because there is complete diversity between Plaintiff and Defendant, and because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs. Plaintiff was and is a resident of the State of New Jersey. Each Defendant is neither incorporated nor has its principal place of business in New Jersey.

13. The Original Venue has personal jurisdiction over Defendant under one or more provisions of CPLR § 302(a)(1) because at all relevant times Defendant has engaged in substantial business activities in the State of New Jersey. At all relevant times, Defendant transacted, solicited, and conducted business within the State of New Jersey. Plaintiff's claims arise out of Defendant's transaction of business and their tortious acts within New York Jersey, from which they realized pecuniary benefit.

14. The Original Venue is proper under 28 U.S.C. § 1391 because Plaintiff is a citizen and resident of Ocean County, New Jersey.

15. Pursuant to MDL No. 3164 Case Management Order No. 4, any plaintiff whose action would be subject to transfer to the aforementioned MDL may file their case directly in the MDL in the United States District Court for the Eastern District of Pennsylvania ("Transfer Venue").

**BACKGROUND**

**I. An Accidental Blockbuster: GLP-1s for Blood Sugar Control and Weight Loss**

16. In the early 1980's it was discovered that the GLP-1 hormone regulates blood sugar. It causes insulin-producing cells of the pancreas to act when blood sugar rises too high.[3]

17. In the early 1990's, Novo Nordisk, another GLP-1 manufacturer, discovered that when they implanted rats with tumors of pancreas cells, which produced large amounts of glucagon and GLP-1, the rats nearly stopped eating.[4]

18. In a video released by the Novo Nordisk Foundation, Dr. Lotte Knudsen stated, "these rats, they starved themselves[,] so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

19. Later testing in human subjects demonstrated that those who received an intravenous drip of Novo Nordisk's GLP-1 RA liraglutide ate 12% less at a lunch buffet as compared to those who received the placebo.[6]

20. From there, Novo Nordisk's research focused not only on the role of GLP-1 RAs in type 2 diabetes management but the role they could play in chronic weight management.

21. In 2002, Eli Lilly started their research and development of exenatide, another GLP-1 RA which was approved for use in the United States in 2005 as Byetta.

22. Between 2017 and present, the FDA has approved Novo Nordisk's GLP-1s, including Ozempic, Wegovy and Rybelsus, semaglutide containing products, for either diabetes management, weight management and/or decreasing the risk of cardiovascular events. These three products primarily differ in dosing schedules.

[3] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html. (Last accessed Jan. 30, 2026).
[4] *Id.*
[5] *Id.*
[6] *Id.*

23. Between 2018 and 2021, Eli Lilly conducted a global series of trials focused on patients with diabetes and found that tirzepatide, their own GLP-1 RA compound, significantly lowered sugar levels and body weight when compared with insulin and other weight loss drugs.

24. On September 14, 2021, Eli Lilly submitted NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On May 13, 2022, the FDA approved NDA 215866.

25. On May 13, 2022, Eli Lilly announced the FDA's approval of NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes. In the press release, Eli Lilly disclosed a safety summary and provided a link to the Medication Guide and Prescribing Information, but NAION was not identified as a risk.

26. No version of the Mounjaro label warns patients or their treating physicians that taking tirzepatide containing drugs may cause NAION or result in permanent vision loss.

27. Eli Lilly also holds the NDA for Zepbound, another one of their GLP-1 RA products containing the active ingredient tirzepatide.

28. No version of the Zepbound label warns patients or their treating physicians that taking tirzepatide containing drugs may cause NAION or result in permanent vision loss.

## II. Defendant Creates a Market: Eli Lilly's Marketing and Promotion of Mounjaro

29. On May 13, 2022, Eli Lilly announced approval of Mounjaro, proclaiming "Mounjaro's safety … in a broad range of adults with type 2 diabetes."[18]

[18] *FDA approves Lilly's Mounjaro™ (tirzepatide) injection, the first and only GIP and GLP-1 receptor agonist for the treatment of adults with type 2 diabetes*, Cision PR Newswire (May 13, 2022) available at https://www.prnewswire.com/news-releases/fda-approves-lillys-mounjaro-tirzepatide-injection-the-first-and-onlygip-and-glp-1-receptor-agonist-for-the-treatment-of-adults-with-type-2-diabetes-301547339.html (last visited on 8/24/23).

30. At all relevant times, Eli Lilly was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Mounjaro.

31. On October 6, 2022, Eli Lilly announced that the FDA had "granted Fast Track designation for the investigation of tirzepatide" to treat obese or overweight adults.[19]

32. In the Fall of 2022, analysts at UBS projected that Mounjaro could reach peak sales of $25 billion, asserting Eli Lilly's position in the multibillion-dollar obesity market.[20]

33. In March 2023, it was reported that Eli Lilly kicked off a full-scale consumer campaign for Mounjaro after launching a digital campaign in January, including a 75-second TV spot supporting Mounjaro aired on FOX on February 12, the same day as Super Bowl LVII.[21]

34. On April 11, 2023, the New York Times reported that Mounjaro was "gaining attention, with many people using it off-label to lose weight." The article described research which "found that Mounjaro may be even more powerful" than Ozempic, which it reported had recently "steamrollered through TikTok, talk shows and tabloids as people raved about using it off-label to lose weight." Although Eli Lilly denied promoting or encouraging "the off-label use of any of our medicines[,]" it was obvious to Eli Lilly and others in the industry that Mounjaro was following Ozempic's rising popularity for its weight loss effects.[22]

## III. Marketing Works: Millions Spent on Mounjaro Advertising Results in Thousands of Prescriptions and Billions in Sales

[19] *Lilly Receives U.S. FDA Fast Track designation for tirzepatide for the treatment of adults with obesity, or overweight with weight-related comorbidities* (October 6, 2022) available at https://investor.lilly.com/newsreleases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on 8/24/23)

[20] Munger L, BioSpace, *Eli Lilly and Novo Nordisk Face Off in Lucrative Obesity Market* (May 30, 2023) available at https://www.biospace.com/article/eli-lilly-and-novo-nordisk-face-off-in-lucrative-obesity-market/ (last visited on 8/24/23).

[21] O'Brien J, Medical Marketing and Media, *Eli Lilly kicks off consumer campaign for diabetes drug Mounjaro* (March 9, 2023) available at https://www.mmm-online.com/home/channel/campaigns/eli-lilly-kicks-off-consumercampaign-for-diabetes-drug-mounjaro/ (last visited on 8/24/23

[22] Blum D, *The Diabetes Drug That Could Overshadow Ozempic,* The New York Times (published April 11, 2023, updated June 24, 2023) available at https://www.nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-lossdiabetes.html (last visited on 8/24/23)

35. As a result of Eli Lilly's all-encompassing advertising and promotional efforts, Mounjaro is wildly prescribed throughout the United States, and Eli Lilly's sales have skyrocketed.

36. In 2022, after Mounjaro was first indicated for diabetes, patients and payers spent about $2,510,000 on this product. By 2023, this rose to $12,420,000.[34]

37. Eli Lilly spent around $139,000,000 on advertising in 2023.[35]

38. Of this 2023 total, $19,600,000 was spent on Eli Lilly's first direct-to-consumer Mounjaro advertisement.[36]

39. From only January to September of 2025, Eli Lilly spent $83,000,000 on promoting Mounjaro.[37]

40. In the 4th quarter of 2025, Eli Lilly's Mounjaro revenue was 4,100,000,000.[38]

## IV. Non-Arteritic Anterior Ischemic Optic Neuropathy and its Sequalae

41. Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition, often referred to as an "eye stroke" which causes irreversible damage to the optic nerve and results in permanent vision loss and blindness.

42. The general opinion amongst the medical community is that NAION is caused by insufficient blood supply or ischemia to the optic nerve.

---

[34] *Spending on GLP1-s has grown dramatically. Here are the details.* (published on August 17, 2025), https://www.ama-assn.org/public-health/behavioral-health/spending-glp-1s-has-grown-dramatically-here-are-details (Last visited on September 24, 2026)

[35] *Health Returns: Weight loss, diabetes drug ad spending tops $1 billion*, CNBC (published April 3, 2024), https://www.cnbc.com/2024/04/03/weight-loss-diabetes-drug-ad-spending-tops-1-billion.html (Last visited September 24, 2026)

[36] *Eli Lilly Spends Big on First Mounjaro TV Commercial for Diabetes*, Talks (published April 6, 2023), https://xtalks.com/eli-lilly-spends-big-on-first-mounjaro-tv-commercial-for-diabetes-3424/ (Last visited September 24, 2026)

[37] *Novo's Wegovy and Ozempic US advertising spend doubles rival Eli Lilly, data shows* (published January 28, 2026), https://www.reuters.com/business/media-telecom/novos-wegovy-ozempic-us-advertising-spend-doubles-rival-eli-lilly-data-shows-2026-01-28/ (Last visited September 24, 2026)

[38] *Lilly reports fourth-quarter 2025 financial results and provides 2026* guidance (published February 4, 2026), https://lilly.gcs-web.com/news-releases/news-release-details/lilly-reports-fourth-quarter-2025-financial-results-and-provides (Last visited September 24, 2026).

43. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have pain such as a headache or periocular pain.

44. NAION and its accompanying vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

45. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[44]

46. About 15% of patients who have NAION in one eye will eventually develop it in their other eye.[45]

47. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many patients with NAION cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Blindless in one or both eyes results in bumps and falls and injuries related to unseen impacts and accidents.

## V. Holder of the NDA: Eli Lilly Has Long Known that the GLP-1 RA Tirzepatide is a Powerful and Dangerous Drug

48. Eli Lilly, through their pre-market and post-market research, knew or should have known of the causal association between the use of its tirzepatide containing products, Mounjaro and Zepbound, and the risk of developing NAION and its sequelae, but they ignored this risk.

49. It has been known since at least 2016 that the human eye contains GLP-1 receptors.[46]

---

[44] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseaes/ischemic-optic-neuropathy (Last accessed Jan. 31, 2026).
[45] *Id.*
[46] 47 Hernández C et al, Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes, DIABETES 2016 Jan;65(1):172-87. doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.

50. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012.[47]

51. Defendant conducts clinical trials and has access to case reports and medical literature that provides it with superior knowledge compared to the general public as to potential risks of its medications.

52. Additionally, clinical observations by neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on another GLP-1 RA, Ozempic, led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

53. The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide," authored by Hathaway et al., involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of whom had type 2 diabetes, and 979 of whom were overweight or obese.[49]

54. Of the 710 patients with type 2 diabetes, 194 were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications. Of the 979 overweight or obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[50]

---

[47] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

[49] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296

[50] *Id.*

55. Within the type 2 diabetes study population, NAION occurred in 17 patients in the semaglutide cohort as compared to 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the non-semaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort as compared to the non-semaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; P < .001; concordance coefficient = 0.84).[51]

56. Within the overweight or obese cohort, NAION occurred in 20 patients in the semaglutide cohort as compared to 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort as compared to 0.8% (95% CI, 0%-1.8%) in the non-semaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort as compared to the non-semaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86.[52]

57. The primary outcome of the Hathaway et al. study is that use of GLP-1 Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[53]

58. Silverii, et al, performed a meta-analysis of all clinical trials of GLP-1 receptor drugs, including Novo Nordisk's own clinical trials, and found a non-statistically increased risk of

---

[51] *Id.*
[52] *Id.*
[53] *Id.*

optic ischemic neuropathy. Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk. However, the study concluded that the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[54]

59. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish-Norwegian cohort study," found an association between use of semaglutide for type 2 diabetes.[55]

60. This cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication. The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[56]

61. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023, 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[57]

62. "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of

---

[54] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomized controlled trials. Diabetes Obes. Metab. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076

[55] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574.

[56] *Id.*

[57] Grauslund J, Taha AA, Molander LD, et al. Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. Intl. Journal of Retina and Vitreous. 2024;10(1):97. doi:10.1186/s40942-024-00620-x

observation for non-exposed." The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[58]

63. Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[59]

64. Due to the findings of the two Denmark studies, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION. PRAC explained that they will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[60]

65. In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[61]

66. A recent case series published by Katz et al., "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," examined nine patients taking GLP-1 RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[62]

67. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[63] The

[58] *Id.*
[59] *Id.*
[60] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/ (Last accessed Jan. 31, 2026).
[61] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link- between-ozempic-and-blindness (Last accessed Jan. 31, 2026).
[62] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. JAMA Ophthalmol. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[63] *Id.*

morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

68. The Katz article also included a report of a man type 2 diabetes taking tirzepatide who reported a painless shade in the superior visual field of his left eye. Diagnostic testing showed that his left optic nerve was swollen. Over the next two months, his optic nerve swelling resolved and was replaced by pallor. Based on his history and examination, he was diagnosed with NAION.

69. A study published on April 7, 2025, analyzing FDA Adverse Event reports, indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[64]

70. Pharmaceutical regulatory agencies updated their GLP-1 RA product labels and/or data sheets to include NAION and/or optic neuropathies.

71. New Zeland's Medsafe had placed GLP-1 RAs, including tirzepatide, under monitoring for adverse events involving acute vision loss.[65] Following this monitoring period,

---

[64] Massy, et al. Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.

[65] *Glucagon-like peptide-1 receptor agonists (dulaglutide, liraglutide, semaglutide, tirzepatide) and acute persistent visual loss – monitoring closes 26 July 2026* (published January 26, 2026), MedSafe, https://www.medsafe.govt.nz/safety/Alerts/Glucagon-like-peptide-1-receptor-agonists-and-acute-persistent-visual-loss.asp (Last visited September 24, 2026).

Medsafe's September 2026 Prescriber Update includes a June 2026 Mounjaro data-sheet update listing NAION in Section 4.8 Adverse Events.[66,67]

72. In July of 2026, Australia's Therapeutic Goods Administration update Moujaro's Section 4.8 Adverse Events, based on postmarketing data, to include NAION: "Eye disorders - Events of non-arteritic anterior ischaemic optic neuropathy (NAION), a rare condition associated with the potential for decreased vision including permanent loss of vision, have been reported in patients treated with products with GLP-1 receptor agonist activity. A sudden loss of vision should lead to ophthalmological examination."[68]

73. On June 6, 2025, PRAC, following their review of non-clinical studies, clinical trials, post-marketing surveillance and medical literature regarding semaglutide, recommend that the semaglutide Product Information be updated to include NAION as a side effect of semaglutide. The announcement explained that this information should be sent to the Committee for Medicinal Products for Human Use, which is responsible for questions concerning medicines for human use, which will adopt PRAC's opinion.[69]

## VI. Defendant's Continuing Failure to Disclose the Risk of NAION and Its Sequalae

74. According to the Drugs@FDA website, the label for Mounjaro has been updated on at least twelve (12) occasions since 2022, with the most recent update on August 27, 2026.[70]

---

[66] *Mounjaro Under the Microscope: What Growing NAION Lawsuits and the Latest Safety Evidence Really Show* (published September 23, 2026), https://www.pharmacytimesnigeria.com/news/international/mounjaro-under-the-microscope-what-growing-naion-lawsuits-and-the-latest-safety-evidence-really-show (Last visited September 24, 2026)

[67] New Zealand Mounjaro Data Sheet (published June 2026), https://www.medsafe.govt.nz/profs/Datasheet/m/MounjaroInj.pdf (Last visited September 24, 2026)

[68] *GLP-1 RAs and rare vision disorder* (published July 23, 2026), Australian Government, https://www.tga.gov.au/news/safety-updates/glp-1-ras-and-rare-vision-disorder (Last visited September 24, 2026)

[69] https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy (Last accessed Feb. 2, 2026).

[70] *See* Drugs@FDA: FDA-Approved Drugs, Mounjaro, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=215866 (Last accessed September 24, 2026).

Despite the fact there are at least thirteen (13) iterations of the Mounjaro label, Defendant's labels have not contained any warning or any information whatsoever on the increased propensity of Mounjaro to cause NAION and permanent vision loss as suffered by Plaintiff.

75. To date, Defendant's tirzepatide containing products, including Mounjaro and Zepbound, labels are still devoid of any mention of NAION.

76. Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Mounjaro or Zepbound, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

77. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

78. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Mounjaro or Zepbound's label without any prior FDA approval.

79. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

**PARTY PLAINTIFF**

80. Plaintiff Gary Stocco is a resident of the state of New Jersey and is currently 59 years old.

81. In June of 2024, Plaintiff was prescribed and started taking Mounjaro to manage his type 2 diabetes, which he used as prescribed through the beginning of October of 2024.

82. On October 3, 2024, Plaintiff began suffering from vision loss in his right eye.

83. On October 4, 2024, Plaintiff was seen at the Wills Eye – Jefferson University Emergency Room. During this visit, Plaintiff told the doctor he had lost vision in more than half of his right eye visual field.

84. Following diagnostic testing and a review of symptoms, it was determined that Plaintiff was suffering from optic nerve edema and inferior field vision loss, and he was diagnosed with NAION in his right eye.

85. Plaintiff attempted steroid treatment to improve his vision. However, this treatment was unsuccessful.

86. Plaintiff's vision loss is permanent, and his life is forever changed due to his use Mounjaro use.

87. Defendant knew or should have known that use of tirzepatide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

88. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and his physicians the true and significant risks associated with this medication.

89. At all times material to the above, the Mounjaro label failed to adequately warn Plaintiff and his medical providers of the true risks of taking Mounjaro.

90. At all times material to the above, marketing and advertising failed to adequately warn Plaintiff and his medical providers of the true risks of taking Mounjaro.

91. Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

92. Defendant's Mounjaro was at all times utilized and prescribed in a manner foreseeable to Defendant.

93. Plaintiff used Mounjaro, and did not misuse, or alter Mounjaro in an unforeseeable manner.

94. As a result of Defendant's actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendant's conduct.

95. As a direct result of being prescribed and using Mounjaro, Plaintiff has been permanently and severely injured, having suffered serious consequences.

96. As a direct and proximate result of his Mounjaro use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

97. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Mounjaro, Plaintiff and would not have used the medication and would have chosen a different option for the treatment of his type 2 diabetes.

**COUNT I: STRICT LIABILITY – FAILURE TO WARN**
**N.J. Stat § 2A:58C-2**

98. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

99. Mounjaro is a product within the meaning of New Jersey Product Liability Act.

100. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Mounjaro and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

101. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping appraised of drug research.

102. Defendant, as a manufacturer, distributer, and marketer of pharmaceutical drugs, including Mounjaro, is held to the level of knowledge of an expert in the field, and accordingly, knew or should have known the warnings and other clinically relevant information and data they distributed regarding the risks associated with the use of Mounjaro were inadequate.

103. Plaintiff does not and did not have the same knowledge as Defendant and Defendant did not provide Plaintiff and Plaintiff's prescribing and treating physicians with adequate warnings, other clinically relevant information or data.

104. Defendant had a duty to provide adequate warnings and instructions for Mounjaro, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their product.

105. Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's prescribing and threating physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Mounjaro as it became or could have become available to Defendant.

106. Defendant marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Mounjaro, to health care providers empowered to prescribe and dispense Mounjaro to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data.

107. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of Mounjaro, which resulted in permanent injuries to Plaintiff.

108. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Mounjaro created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

109. Despite the fact that Defendant knew or should have known that Mounjaro caused and causes unreasonable and dangerous side effects, it continues to promote and market Mounjaro without providing adequate clinically relevant information.

110. Defendant knew or should have known that consumers, including Plaintiff, would foreseeably and needlessly suffer injury as a result of Defendant's failures.

111. The Mounjaro supplied to Plaintiff by Defendant was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendant possessed knowledge and information confirming the defective and unreasonably dangerous

nature of Mounjaro but, despite this knowledge and information, Defendant failed and neglected to issue adequate warnings that Mounjaro causes serious and potentially irreversible vision issues, optic nerve damage, and NAION.

112. Defendant has yet to issue any warnings or recommendations that patients taking Mounjaro should undergo ophthalmological monitoring prior to starting the drug and while taking the drug.

113. Defendant's failure to provide adequate warnings or instructions rendered Mounjaro unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendant, and in that the risk of danger outweighs the benefits.

114. Defendant continues to fail to provide adequate warnings to the medical community, including physicians and pharmacies, as well as consumers, including Plaintiff.

115. Defendant failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Mounjaro including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

116. Defendant failed to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

117. Defendant continued to aggressively promote and sell Mounjaro, even after Defendant knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drug.

118. Defendant had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Mounjaro, and/or that safer and or an equally effective alternative drug product exists that does not pose this same risk.

119. By failing to adequately test and research harms associated with Mounjaro, and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Mounjaro and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Mounjaro. The medical community, patients, patients' families, or regulators were not appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Mounjaro and should or could be reported as an adverse event.

120. The tirzepatide products, including Mounjaro, designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant were defective due to inadequate post-marketing surveillance and/or warnings because even after Defendant knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Mounjaro, Defendant failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote the drug.

121. Mounjaro is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

122. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Mounjaro could have been reduced or avoided by Plaintiff,

prescribers, and/or other consumers if Defendant had provided reasonable instructions or warnings of these foreseeable risks of harm.

123. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT II: STRICT LIABILITY – DESIGN DEFECT**
**N.J. Stat § 2A:58C-2**

124. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

125. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Mounjaro. These actions were under the ultimate control and supervision of Defendant.

126. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting

pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping apprised of drug research.

127. Defendant, as a manufacturer, designer, distributer, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff. Despite this duty, Defendant placed this drug into the stream of commerce in a defective and unreasonably dangerous condition.

128. Mounjaro is designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and were kept on the market despite this defective condition.

129. Defendant knew or should have known that Mounjaro, which Defendant developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that it posed a serious risk of severe and permanent vision and optic nerve injuries.

130. Defendant had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor its product.

131. Defendant sold, marketed and distributed its tirzepatide products, which are unreasonably dangerous for their normal, intended, and foreseeable use.

132. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Mounjaro, a defective product which created an unreasonable risk to the health of consumers, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

133. The Mounjaro supplied to Plaintiff by Defendant was defective in design or formulation in that when it left the hands of the manufacturer or supplier it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendant in that is

posed and poses a risk of serious and potentially irreversible vision issues and optic nerve damage to patients.

134. The Mounjaro taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

135. The Mounjaro taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

136. Mounjaro is a medication indicated to aid in diabetes management. However, Mounjaro causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes.

137. Plaintiff, ordinary consumers, and prescribers would not expect a drug designed and labeled for diabetes management and cardiovascular health benefits and marketed as such to cause irreversible vision issues and optic nerve damage.

138. The Mounjaro supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

139. The Mounjaro supplied to Plaintiff by Defendant was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of Mounjaro makes the product unreasonably dangerous.

140. Mounjaro's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

141. The intended or actual utility of Mounjaro is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

142. Mounjaro's design defects render it more dangerous than other drugs and therapies designed for diabetes management in that Mounjaro causes an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage.

143. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Mounjaro created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

144. Mounjaro is defective and unreasonably dangerous to Plaintiff and other consumers in that despite knowledge that Mounjaro use could result in vision issues, Defendant failed to adequately test or study the drug, including but not limited to: pharmacokinetics and pharmacodynamics of the drug, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

145. Defendant acted unreasonably in its design of Mounjaro in that Defendant failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

146. Defendant knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Mounjaro's defective design.

147. Mounjaro is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendant had exercised all possible care in the preparation and sale of these products.

148. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT III: BREACH OF EXPRESS WARRANTY**
**N.J. Stat. Ann. § 12A:2-101 *et seq.***

149. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

150. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Mounjaro and placed the drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

151. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping appraised of drug research.

152. Defendant expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendant and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Mounjaro was safe, effective, fit and proper for its intended use.

153. Mounjaro materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Mounjaro, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Mounjaro sold to Plaintiff.

154. Defendant expressly warranted that Mounjaro was safe and well-tolerated. However, Defendant did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Mounjaro was particularly dangerous to the well-being of Plaintiff and Plaintiff’s vision.

155. Mounjaro does not conform to those express representations because Mounjaro is defective, not safe, and has serious side effects.

156. Plaintiff and Plaintiff's physicians justifiably relied on Defendant’s representations regarding the safety of Mounjaro, and Defendant’s representations became part of the basis of the bargain.

157. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendant's representations that Mounjaro was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

158. Plaintiff's healthcare providers justifiably relied on Defendant's representations through Defendant's marketing and sales representatives in deciding to prescribe Mounjaro over other alternative treatments on the market, and Plaintiff justifiably relied on Defendant's representations in deciding to purchase and use the drug.

159. Plaintiff purchased and used Mounjaro without knowing that drug is and was not safe and well-tolerated and without knowing that drug causes significant and irreparable vision loss and eye damage.

160. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT IV: CONSUMER FRAUD**
**N.J.S.A. 56:8 *et seq.***

161. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

162. Defendant's actions resulted in violation of the New Jersey Consumer Fraud Act.

163. Plaintiff purchased and used Mounjaro primarily for personal use and therefore suffered ascertainable losses as a result of Defendant's actions in violation of N.J.S.A. 56:8 *et seq*.

164. Had Defendant not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Mounjaro and would not have incurred damages.

165. Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendant not engaged in unfair and deceptive conduct.

166. Despite knowing the falsity and misleading nature of their claims, Defendant engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Mounjaro.

167. Defendant intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Mounjaro.

168. Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Mounjaro.

169. Defendant had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Mounjaro.

170. Defendant's deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff Gary Stocco constituted unfair and deceptive acts and trade practices in violation of N.J.S.A. 56:8 *et seq*.

171. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Mounjaro, Plaintiff Gary Stocco suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT V: PUNITIVE DAMAGES**
**COMMON LAW**
**PUNATIVE DAMAGES ACT - N.J.S.A. 2A:15-5.9, *et seq.***
**PRODUCT LIABILTY ACT - N.J.S.A. 2A:58C-1 *et seq.***

172. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

173. The acts and omissions of Defendant described herein consisted of oppression, fraud, and/or malice, and were done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendant's officers, directors, and/or managing agents.

174. Defendant's actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

175. Defendant misled both the medical community and the public, including Plaintiff and his physicians, by making false representations about the safety and effectiveness of Mounjaro and by failing to provide adequate instructions concerning its use.

176. Defendant downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Mounjaro despite available information demonstrating that drug could cause NAION and irreversible vision loss.

177. Defendant was or should have been in possession of evidence demonstrating that Mounjaro use could cause NAION and irreversible vision loss. Nevertheless, Defendant continues to market Mounjaro by providing false and misleading information with regard to its safety and effectiveness.

178. Defendant failed to provide warnings that would have dissuaded health care professionals from using Mounjaro, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Mounjaro.

179. As a proximate result of Defendant's acts and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to his use of Mounjaro.

180. As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

181. Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

182. Defendant's actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

183. Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendant.

184. Defendant's conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

185. Consequently, Defendant is liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, and severally, as follows:

a. Judgment in favor of Plaintiffs and against all Defendants, for damages in such amounts as may be proven at trial;

b. Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, loss of consortium, disfigurement, pain and suffering, mental anguish, and emotional distress, in such amounts as may be proven at trial;

c. Punitive and/or exemplary damages in such amounts as may be proven at trial;

d. Attorneys' fees and costs;

e. Interest; and

f. Any and all further relief, both legal and equitable, that the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated: September 29, 2026

SULLIVAN PAPAIN BLOCK MCMANUS
COFFINAS & CANNAVO P.C.

/s/ *Craig M. Silverman*
Craig M. Silverman (#16898)
120 Broadway – 27th Floor
New York, New York 10271
Phone: (212) 732-9000
Fax: (212) 266-4141
Csilverman@triallaw1.com

*Attorneys for Plaintiffs*